FILED

2013 Jan-22  AM 11:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

| | | |
|---|---|---|
| AMY LYNN WILLMORE-COCHRAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 4:11-cv-2140-JEO |
| | ) | |
| WAL-MART ASSOCIATES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION & ORDER

In her complaint this action, Amy Lynn Willmore-Cochran ("Plaintiff") brings claims alleging race discrimination in violation of 42 U.S.C. § 1981; interference and retaliation in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*; as well as claims arising under Alabama law for breach of contract and breach of the covenant of good faith and fair dealing. (Doc.[1] 1 ("Complaint" or "Compl.")). She brings the action against her former employer, whom she identifies as "Wal-Mart Associates, Inc." ("Wal-Mart")[2]. The case now comes to be heard on Wal-Mart's motion for summary judgment. (Doc. 14). Upon

---

[1]Citations to "Doc(s). ___" are to the document numbers assigned by the clerk to the pleadings, motions, and other materials in the court file, as reflected on the docket sheet.

[2]In its pleadings, the defendant states that its correct name is actually "Wal-Mart Stores East, LP" and that "Wal-Mart Associates, Inc." is not a proper party to this action. (Doc. 5 at p.1 & ¶ 6; Doc. 13 at p. 1 & ¶ 6). As of this time, however, Plaintiff has yet to file an amended complaint to change the name of the defendant. The court will refer to the defendant throughout simply as "Wal-Mart."

consideration, the court[3] concludes that Wal-Mart's motion is due to be granted in part and denied in part.

## I.      SUMMARY JUDGMENT STANDARDS

Pursuant to Rule 56 of the FEDERAL RULES OF CIVIL PROCEDURE a party is authorized to move for summary judgment on all or part of a claim asserted against the movant.  Under that rule, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P.  56(c).  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 324.

Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(A), (B), Fed. R. Civ. P.  Acceptable materials under Rule 56(c)(1)(A) include "depositions, documents, electronically stored information, affidavits or declarations,

---

[3]The parties have consented to the exercise of plenary jurisdiction by a magistrate judge. *See* 28 U.S.C. § 636(c); LR 73.2.  (Doc. 23).

stipulations ... , admissions, interrogatory answers, or other materials."

At summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Accordingly, in its review of the evidence, a court must credit the evidence of the nonmovant and draw all justifiable inferences in the non-movant's favor. *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000).

## II.    BACKGROUND[4]

On November 13, 2008, Plaintiff, a white female, submitted an application for employment with Wal-Mart. (Ex. 3 to Plaintiff's Deposition ("Pl. Depo.")[5], Bates 00053). The final portion of the application was a section marked "**IMPORTANT**," which directed the applicant to "carefully" read and initial several statements. (*Id.* (emphasis original)). One of those statements included the following:

> I understand that this application is not a contract, offer, or promise of
> employment and that if hired, I will be able to resign at any time for any reason.
> Likewise, the company can terminate my employment at any time with or without
> cause, unless otherwise required by law. I further understand that no one other
> than the President of Wal-Mart Stores, Inc., or Vice President of its People

---

[4]The background set forth in this section represents the facts and circumstances as discerned by the court from the pleadings and the parties' respective evidentiary submissions, in light of the relevant summary judgment standard requiring that the record be viewed in the light most favorable to the nonmoving party. Accordingly, these are the "facts" for purposes of summary judgment only; they may not be the actual facts.

[5]Plaintiff's Deposition and the Exhibits thereto are Exhibit A to Wal-Mart's evidentiary submission in support of its motion for summary judgment. Plaintiff's deposition itself, including the word index, is found within Docs. 16-1, 16-2 and pages 1-8 of Doc. 16-3. The exhibits to Plaintiff's deposition, marked as Ex. 1 through Ex. 17, are encompassed within pages 9-45 of Doc. 16-3 and the entirety of Doc. 16-4

Division has the authority to enter into an employment contract or agreement with me, and that my at-will employment can be changed only by a written agreement signed by the President of Wal-Mart Stores, Inc.  I have read, understand and agree to this statement.

(*Id.*)  Plaintiff initialed that statement and affixed her full signature to the application just below it.  (*Id.*)  On November 21, 2008, Plaintiff signed an application addendum that similarly stated, "I understand that this application is not a contract, offer, or promise of employment and that if hired, I will be able to resign at any time for any reason.  Likewise, the company can terminate my employment at any time with or without  cause." (*Id.*, Bates 00057).  Wal-Mart hired Plaintiff, and, on December 1, 2008, she began working in a store in Gadsden, Alabama, as a part-time Sales Associate in the Menswear Department.

Near the end of April 2009, Plaintiff applied for a transfer to a Pharmacy Clerk position. She was awarded that position by the Manager of the Pharmacy Department, Jimmy Crump, a white male.  (Ex. 4 to Pl. Depo., Bates 00046).  Crump became Plaintiff's immediate supervisor. The job offer sheet upon which Plaintiff indicated that she accepted the position also stated that it did not "create[ ] an express or implied contract of employment or any other contractual commitment."  (*Id.*)  Plaintiff remained in that position in the pharmacy until her employment was terminated on April 27, 2011.

Plaintiff has irritable bowel syndrome ("IBS"), which causes her at times to experience symptoms that include constipation, diarrhea, spasms, bloating, cramping, and exhaustion.  (Pl. Depo. at 33-38).  Flare-ups occur sporadically for Plaintiff, anywhere from once a week to once every couple of months.  (*Id.* at 35).  When she has such attacks, Plaintiff takes up to six doses of Imodium, an over-the-counter medication generally used to treat diarrhea, although it is not

4

always effective.  (*Id.* at 9-10, 34-35).  Plaintiff's IBS has caused her to visit hospital emergency rooms on several occasions.  (Pl. Depo. at 43-44).  However, the record only specifies one such visit – at the ER at Gadsden Regional Hospital because she was experiencing bloody bowel movements in about November 2009.  (*Id.* at 36-38; Doc. 19-1, ¶ 7).  She also saw her regular physician, Dr. Herschel Patel in late 2009 or early 2010, for problems with her stomach   (Pl. Depo. at 33).  Dr. Patel referred Plaintiff to Dr. Vipul Amin at Digestive Disease Specialists, who saw Plaintiff two separate times and diagnosed her with IBS or chronic gastritis.  (*Id.* at 32-33, 43-44).  The first visit to Dr. Amin was an initial consultation, and the second, on April 30, 2010, involved administration of an endoscopy and a colonoscopy.  (*Id.*; Docs. 19-12, 19-13, and 19-14).  Later, sometime "after the first of the year" in 2011, Plaintiff's IBS again caused her to have bloody bowel movements, this time about two to three hours into her shift at work.  (Pl. Depo. at 36-37).  That circumstance prompted Plaintiff to go home early, around lunchtime.  (*Id.* at 36-38).  Plaintiff did not go to the hospital on that occasion, although she followed the same course of treatment at home that had been recommended when she had visited the ER in November 2009: drinking clear fluids, avoiding solid foods, and resting. (*Id.* at 36-37).

Plaintiff has also been diagnosed with occasional migraine headaches (*id.* at 39), which have caused her to visit the emergency room "several times" since 2006.  (Doc. 19-1, ¶ 7).  When Plaintiff has such an episode, she "typically" gets a "visual aura," which she describes as a "spot that shows up in the middle of [her] field of vision" and "grows ... to the point that it blocks [her] ... vision in that eye."  (Pl. Depo. at 40-41).  That is usually followed by a headache, light and sound sensitivity, and nausea.  (*Id.* at 41-42).  For her migraines, Plaintiff takes Imitrex, a prescription medication, and "most of the time" she has to apply an ice pack, and retreat to a

cold, dark room.  (*Id.*)

During Plaintiff's employment, Wal-Mart had a written, four-step progressive discipline policy entitled, "Coaching for Improvement."  (*See* Ex. 1 to Declaration of Kim Rancher ("Rancher Decl."), Doc. 16-5 ("Coaching Policy"), Bates 00556 - 00559; Pl. Depo. at 147).  At the first step of that Coaching Policy, a supervisor may use a "verbal coaching" to explain that an employee's job performance or conduct does not meet expectations and advise corrective action.  (Coaching Policy at Bates 00556).  The policy also expressly provides, however, that a "verbal coaching ... may be skipped if the job performance or conduct warrants a higher level of coaching."  (*Id.*)  The second step of the process is a "written coaching."  (*Id.*, Bates 00557).  Under it, a supervisor notifies the employee "in writing that [the employee's] job performance or conduct does not meet [Wal-Mart's] expectations or when [the employee has] failed to correct a job performance or conduct issue despite prior Verbal coaching or if the [problem] warrants a Written level of coaching."  (*Id.*)  The third step is a "Decision Making Day," which Wal-Mart employees sometimes refer to colloquially as a "D-Day."  (*Id.*)  During a Decision Making Day, a supervisor provides the employee written notice of job performance or conduct problems and meets with the employee to discuss corrective action, as with a Written coaching.  In addition, the employee must also take off his or her next scheduled work day to develop and submit a "plan of action to correct the problems or concerns that exist."  (*Id.*)  On the employee's next scheduled work day after that, the employee must again meet with the supervisor to review the proposed plan of action and discuss the corrective action to be undertaken.  (*Id.*, Bates 00557).  At the fourth and final step of the process, Wal-Mart's policy provides that the employee "will be terminated," if, after having received a Decision Making Day, the employee has any further

"unacceptable job performance or conduct [that] warrants a coaching level" in the 12 months thereafter.  (*Id.*)

Wal-Mart also has an "Open Door" policy by which employees are authorized to communicate any workplace-related suggestions, questions, and concerns to various levels of management, either in person, online, via e-mail, another writing, or by phone.  (*See* Pl. Depo. at 132-33; Ex. 8 to Rancher Decl., Bates 0583-84).  Under the written Open Door Policy, employees are encouraged first to give their immediate supervisor an opportunity to receive and resolve concerns.  (Ex. 8 to Rancher Decl. ("Open Door Policy"), Bates 00583).  However, if an employee is complaining about their immediate supervisor or the employee is not satisfied with the way that her immediate supervisor has addressed the situation, the employee is authorized to raise the concern with a higher level of management.  (*Id.*)  The Open Door Policy also provides: "Retaliation for initiating an open door or cooperating in an investigation relating to any open door is strictly prohibited.  Any associate who retaliates against another associated for cooperating in an investigation will be subject to disciplinary action, up to and including termination."  (*Id.*, Bates 00584).

While employed in the pharmacy, Plaintiff made numerous complaints, both to her supervisor Crump and eventually to others in Wal-Mart management, regarding work rule violations and perceived deficiencies of other employees.  In particular, Plaintiff says that on eight to twelve occasions she observed another Pharmacy Clerk, Angela Rice, who is African-American, mistakenly sell a prescription order to the incorrect customer.  She reported each of those incidents to Crump.  (Pl. Depo. at 134-39, 174).  While Crump told Plaintiff that he appreciated her concern and that he would "look into" the matter, Plaintiff believed that Crump

7

was refusing to write Rice up or otherwise discipline her, at least initially.  (*Id.*)  Unsatisfied with

Crump's response, Plaintiff lodged an online complaint with Wal-Mart's Global Ethics Office,

dated December 6, 2009, in which she stated that "a cashier has repeatedly given out the wrong

medications to the wrong customer and in the 7 months that she has been there, the manager of

our pharmacy has not coached her, written her up, or anything."  (Doc. 19-5 at 5; *see also* Pl.

Depo. at 145-47).  The Global Ethics Office responded by e-mail several days later, telling

Plaintiff that, "[a]s described, your concerns to not require an investigation from our office,"

suggesting that the circumstances did not implicate a violation of Wal-Mart's "Statement of

Ethics."  (Doc. 19-5).  The Global Ethics Office further advised, however, that Plaintiff might

instead "use Wal-Mart's Open Door procedure and speak with your Market Health & Wellness

Manager, Michael Hill."  (*Id.*)

Plaintiff also says that after making "five or six complaints about Ms. Rice to Mr. Crump

and seeing it not go anywhere" (Pl. Depo. at 141), she reported the situation to two store assistant

managers, "Jennifer" and "Kelly," whose last names she did not know.  (*Id.* at 142, 154).  They

advised Plaintiff that, because the issue involved the Pharmacy Department, they were not

authorized to address it but that she could tell Gary Tavis, the District Health and Wellness

Manager.  (*Id.* at 142-43).  Plaintiff accepted that advice and told Tavis about Rice's errors and

that Crump was not disciplining her.  (*Id.* at 140-43).  Plaintiff estimates that their first such

conversation occurred in about January or February 2010.  (*Id.* at 143).  According to Plaintiff,

after she had spoken twice about the Rice situation with Tavis, he came to the store and held a

private meeting in the back area with Crump and Rice, after which Plaintiff observed that Rice

"was not real happy when she came back."  (*Id.* at 141-42).  Plaintiff deduced from those

circumstances that Rice had received a formal coaching.  (*Id.*)

On July 16, 2010, Plaintiff herself received a written coaching from Crump, for what was, ironically, the very same type of error for which she had reported Rice: that she accidentally sold a prescription to the wrong customer at check-out.  (Ex. 11 to Pl. Depo., Bates 00009-00011; *see also* Pl. Depo. at 155-158; Declaration of James Crump, Jr. ("Crump Decl."), ¶ 10).  Plaintiff admits that she was guilty of the charged misconduct, emphasizing that she was the one who both discovered and self-reported the mistake.  Plaintiff complained to Crump, however, that it was still unfair he was issuing her a written coaching.  (Pl. Depo. at 155-58).  First, she suggested that, because this was her first disciplinary offense, she should have at most received only a verbal coaching, as provided for at step one of Wal-Mart's Coaching Policy, rather than the written coaching at step two.  Second, Plaintiff claimed that the write-up was unfair because Crump had, she said, allowed Angela Rice to commit the same type of error on numerous occasions without disciplining her.  Despite such objections, Crump allowed Plaintiff's written coaching to stand.

On September 3, 2010, Plaintiff reached the third step of Wal-Mart's progressive discipline procedure, with a Decision Day coaching given by Dale Lasseter, an assistant store manager.  (Ex. 12 to Pl. Depo., Bates 00010-11; Pl. Depo. at 159-161).  The write-up itself does not specify the particular offense conduct other than to state that Plaintiff "has had numerous complaints of rude behavior toward customers and associates."  (*Id.*, Bates 00010).  The write-up further warned: "Change attitude.  Stay focused on your tasks and responsibilities, quit worrying about what everyone else is doing.  Rudeness will not be tolerated in any form or fashion.  If behavior doesn t (sic) change Amy will be terminated."  (*Id.*)  Plaintiff claims, however, that this

coaching was precipitated by an incident occurring the same day in which a "red faced" Lasseter angrily accused Plaintiff of being rude to a customer, namely, Lasseter's own son, by refusing to allow him to pay for a prescription in another department of the store. (*See* Pl. Depo. at 159-70).

Plaintiff maintains that her D-Day coaching was unfair because she was merely enforcing a rule that had been approved by Crump about a year earlier in which customers were required to pay for prescriptions at the pharmacy counter. (*Id.* at 160-61, 164-66, 173-74). Plaintiff also considers the coaching to have been "biased" and "nepotistic" because it was founded upon a complaint by a family member of the manager who issued it, Lasseter. (*Id.* at 169-70). Plaintiff further testified that immediately after Lasseter left the meeting in which he imposed the Decision Day coaching, Crump, who had witnessed the coaching, made a remark to Plaintiff about "letting this carry over and be punishment for going over his head." (*Id.* at 162).

On April 27, 2011, Plaintiff called in and reported that she might be late for her shift as a result of severe storms and tornados moving through Alabama. Crump's employment with Wal-Mart had ended on December 10, 2010. (Crump Decl. ¶ 2). He was replaced as the Pharmacy Department Manager on January 29, 2011 by Kim Rancher, an African-American woman who had been working as a staff pharmacist since May 2010. (Rancher Decl. ¶ 2). Although Plaintiff was ultimately on time for her shift on April 27th, Rancher states that Plaintiff's call-in prompted her to review Plaintiff's attendance record. Under Wal-Mart's attendance policy, an employee who has an "active" coaching, *i.e.*, a coaching under the Coaching Policy within the preceding twelve months, is subject to the next level of coaching upon accruing four unexcused absences in a rolling six-month period. (Ex. 2 to Rancher Decl., Bates 00450-00451 ("Attendance Policy"). Further, an employee is deemed "tardy" if she begins work 15 minutes or more after the start of

10

her shift, and she is similarly counted as "left early" if she leaves work 10 minutes or more before the end of the shift.  (*Id.*) The employee is charged with an "incomplete shift," if she works at least half the scheduled shift; if she reports but works less than half a shift, she is charged with an "absence." (*Id.*)  Once the employee has accumulated three unapproved incomplete shifts, through any combination of beginning work late or leaving work early, the employee is deemed to have accrued one unapproved absence.  (*Id.*)   However, time missed from work because of a qualifying health condition under the FMLA is not to be counted against the employee.  (*Id.*) The attendance record Rancher reviewed showed that, in the preceding six months, Plaintiff had accrued five absences, all listed as "unapproved," occurring on the following dates: (1) November 4, 2010; (2) November 22, 2010, based upon three unapproved incomplete shifts; (3) December 29, 2010; (4) December 30, 2010; and (5) an incomplete shift on January 22, 2011, that was counted as an absence because she left early and missed more than half the shift.  (*See* Rancher Decl. ¶¶ 9-13; Ex. 4 to Rancher Decl., Bates 00004-00006).

About an hour after clocking in on April 27, 2011, Plaintiff was called to the back of the store.  (Pl. Depo. at 205-06).  There she met with Rancher and two assistant store managers who presented Plaintiff with an attendance report showing that she had accumulated five unexcused absences in the preceding six-months, on the dates identified above.  The managers further advised Plaintiff that her absences violated the attendance policy and that because she had an active D-Day coaching, the next step under the Coaching Policy was to terminate her employment.  (Ex. 15 to Pl. Depo.)  Plaintiff responded by pointing out the days she missed on December 29 and 30, 2010, only counted as a single recurring absence under the attendance policy because they were consecutive days and were for the same reason.  (*See* Pl. Depo. at 196-

11

97, 208-09; *see also* Attendance Policy, Bates 00450).  Although the managers conceded that Plaintiff was correct on that point (Pl. Depo. at 208-09), they told her that she was nonetheless terminated because she would still have four unexcused absences in the prior six months.  (Pl. Depo. at 208-10).

This lawsuit followed in June 2011.  In Count One, Plaintiff maintains that she was subjected to disparate discipline because of race in violation of 42 U.S.C. § 1981.  (Compl., ¶¶ 51-52).  In Counts Two and Three, Plaintiff brings claims under the FMLA.  (Compl. ¶¶ 53-55).  Specifically, Plaintiff contends that Wal-Mart interfered with her rights and subjected her to unlawful retaliation (1) by failing to inform her that she was eligible for intermittent leave under the FMLA for her chronic health conditions and (2) by terminating her employment based on absences that Plaintiff claims qualified for FMLA leave.  (*Id.*, ¶¶ 54-55).  Counts Four, Five, and Six, raise claims under Alabama state law.  (Compl. ¶¶ 56-58).  The first two of those assert claims for breach of Plaintiff's employment contract, whether express or "implied-in-fact," founded upon allegations that her termination was inconsistent with Wal-Mart's Coaching Policy and its Open Door Policy.  (*Id.*)  In Count Six, Plaintiff claims that  Wal-Mart breached the "covenant of good faith and fair dealing with Plaintiff."  (*Id.*, ¶ 58).  Such claim is founded upon Wal-Mart's alleged "violation of its Open Door and progressive discipline policies, its failure to apprise Plaintiff of her [FMLA] rights ... and to honor such leave when it was taken, its nepotistic and racially-biased preferential treatment of employees ..., and its retaliatory discharge of Plaintiff."  (*Id.*)

Following the close of discovery, Wal-Mart moved for summary judgment.  (Doc. 14). The parties have fully briefed that motion (Doc. 15 ("Wal-Mart Summ. J. Brief"); Doc. 18 ("Pl.

Opp. Brief"); and Doc. 21 ("Wal-Mart Reply Brief")) and filed evidentiary materials (Docs. 16,

19) in support of their respective positions.  Wal-Mart's motion is now ripe for decision.


**IV.    DISCUSSION**

    **A.    § 1981 Claims**

        **1.    Introduction**

Section 1981 gives "all persons the same right to make and enforce contracts as is

enjoyed by white citizens."  42 U.S.C. § 1981(a).  For purposes of the statute, "the term 'make

and enforce contracts' includes the making, performance, modification, and termination of

contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual

relationship."  42 U.S.C. § 1981(b).  Section 1981 thus prohibits a range of material adverse

actions in private employment because of race.  *See CBOCS West, Inc. v. Humphries*, 553 U.S.

442, 450-51, 454-55 (2008).  Further, despite its wording, the statute prohibits race

discrimination against whites as well as nonwhites.  *McDonald v. Santa Fe Trail Transportation

Co.*, 427 U.S. 273, 287 (1976).  Section 1981 also authorizes a cause of action for retaliation,

prohibiting an employer from taken material adverse actions motivated by complaints in

opposition to conduct that violates § 1981's substantive prohibition against race discrimination.

*See CBOCS West,*, 553 U.S. at 446; *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249,

1257-58 (11th Cir. 2012); *Bryant v. Jones*, 575 F.3d 1281, 1301 (11th Cir. 2009).  Plaintiff is

clearly asserting claims for racially disparate treatment in violation of § 1981.  She appears also

now to claim that she was subjected to unlawful retaliation under the statute.

2.      § 1981 Retaliation

As a preliminary matter, any claim for retaliation under § 1981 must fail, because her

Complaint fails to provide fair notice that she has asserted any claim based on activity protected

under that statute.  While § 1981 does authorize claims for retaliation, it is not a general

whistleblower protection statute.  Rather, in order to constitute statutorily protected activity

capable of supporting a § 1981 retaliation claim, an employee's complaint must reasonably

convey that she is opposing discrimination based specifically upon race, versus some other type

of discrimination or injustice generally.  *See Pennington v. City of Huntsville*, 261 F.3d 1262,

1265 n. 1 (11th Cir. 2001); *Graham v. Methodist Home for the Aging*, No. 2:11-cv-1416-SLB,

2012 WL 3637587, *24 (N.D. Ala. Aug. 20, 2012).  Moreover, the employer's racially

discriminatory conduct complained of must actually violate § 1981 or, at a minium, the

plaintiff's complaint must be based on a belief that is both objectively reasonable and

subjectively in good faith that the conduct violates § 1981.  *See Jimenez v. Wellstar Health Syst.*,

596 F.3d 1304, 1311 n. 6 (11th Cir. 2010); *Butler v. Alabama Dep't of Transp.*, 536 F.3d 1209,

1213 (11th Cir. 2008).

While Plaintiff does claim in her Complaint that she was subjected to race discrimination,

for which she expressly seeks to recover pursuant to "42 U.S.C. § 1981" (*id.* at p. 12, "First

Cause of Action"),  nowhere does she cite § 1981 as a basis for a claim of retaliation.  Plaintiff

does aver that both her Decision Day coaching and her prior written coaching amounted to

"retaliation" by a "vengeful" Crump for certain complaints that Plaintiff had made under Wal-

Mart's Open Door Policy.  (*See* Compl. ¶ 39; *see also id.* ¶¶ 32-38).  Specifically, Plaintiff pleads

that she had previously used the Open Door Policy to "complain of mismanagement in the

14

Pharmacy" (Compl. ¶ 33), as well as "about the numerous mistakes that her coworker Angela Rice was making ... and their lack of correction [by Crump]." (*Id.* ¶ 36). Plaintiff further alleges that Crump considered those Open Door complaints to be "insubordination," and that as a consequence, "the embarrassed Crump" first retaliated by giving Plaintiff the written coaching and then later played a role in "backing" or otherwise causing Plaintiff's Decision-Day coaching. (*Id.* ¶ 39; *see also id.* ¶¶ 31, 34, 35).

Nonetheless, those allegations fail to give fair notice that Plaintiff claims to have made any complaint during the course of her employment about race discrimination that might be protected by § 1981. Plaintiff's vague claim that she complained about "mismanagement in the Pharmacy" does not reasonably support a contention that she thereby raised any issue of race discrimination. *See Graham,* 2012 WL 3637587, at *24. Faring no better is her assertion that she complained to Gary Tavis sometime prior to June 2010, both about Rice's medication errors and Crump's failure to discipline her for them. For liability to attach under federal employment law, it must be shown that the employer took some materially adverse action based on a protected characteristic or activity. *See generally Burlington Northern & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 67-68 (2006). No matter what the race of anyone involved, voicing concerns that simply question another employee's competence or job performance do not themselves implicate § 1981 because there is no charge that the employer has taken adverse action against anyone. Likewise, while Plaintiff alleges that she complained about Crump's failure to discipline Rice, Plaintiff does not allege that she ever asserted that such inaction was due to race. But even if she had, it is clear that an employer's *failure* to discipline an employee does not itself show a violation of § 1981 because, again, the employer has not taken adverse action against anyone.

15

*See Butler*, 536 F.3d at 1216 (the fact that African-American plaintiff obeyed employer's work rule and was not disciplined is not an adverse employment action even if her white co-workers did violate the rule but suffered no discipline); *Wehunt v. R.W. Page Corp.*, 352 F. Supp. 2d 1342, 1353 (M.D. Ga. 2004) (employer's alleged failure to discipline plaintiff's African-American co-employees was not adverse employment action under Title VII); *Hall v. City of Chicago*, 152 F. Supp. 2d 962, 969 (N.D. Ill. 2001) ("Although an employer's failure to discipline an employee when he calls another a 'bitch' might be evidence of a hostile work environment, in and of itself, it is not actionable under Title VII.").  Thus, absent a complaint that Plaintiff or some other employee of another race *was* disciplined for the same or similar misconduct, it would be objectively unreasonable to think that an employer's failure to discipline an employee could itself violate § 1981. *Cf. Butler*, 536 F.3d at 1213-14 (plaintiff's belief that white co-worker's racial epithet amounted to an unlawful employment practice under Title VII was objectively unreasonable and thus could not support a retaliation claim).  Plaintiff has not properly pled a § 1981 retaliation claim, and she may not raise one by virtue of argument in her summary judgment brief.  *See GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1258 n. 27 (11th Cir. 2012).

### 3.      § 1981 Disparate Treatment

#### a.      Introduction and Framework

Plaintiff claims that she was subjected to discipline in violation of § 1981.  She clearly asserts such a claim based upon her termination.  However, she also appears to raise § 1981 claims in connection with the two levels of disciplinary action that ultimately led to her discharge under the progressive discipline policy, namely, her written coaching and her Decision Day

16

coaching.  Plaintiff attempts to prove those claims by using circumstantial, rather than direct, evidence of discrimination, and the parties agree that the familiar *McDonnell Douglas* burden-shifting framework applies.  *See McDonnell Douglas v. Green*, 411 U.S. 792 (1973); *see also Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981); *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989).  Under that framework, the plaintiff has the initial burden to prove a prima facie case of discrimination.  *Burdine*, 450 U.S. at 252-53.  "Under the *McDonnell Douglas* scheme, 'establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee.'"  *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993) (quoting *Burdine*, 450 U.S. at 254).  This presumption "places upon the defendant the burden of producing an explanation to rebut the prima facie case- *i.e.*, the burden of 'producing evidence' that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'"  *Id.*, 509 U.S. at 506-07 (quoting *Burdine*, 450 U.S., at 254).  Once the defendant produces sufficient evidence to support a nondiscriminatory explanation for its decision, the plaintiff must be afforded the "opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  *Burdine*, 450 U.S. at 253.  "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'"  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000) (*quoting Burdine*, 450 U.S. at 253).

### b.      Written Coaching

Plaintiff asserts that her written coaching amounted to disparate treatment because of race

17

in violation of § 1981.[6]  This claim is based on the allegation that Crump gave her that write-up

in July 2010 for mistakenly selling a prescription to the wrong customer, but he allowed

Plaintiff's African-American co-worker, Angela Rice, to commit the very same type of error

many times before giving her a written coaching.  Plaintiff argues that if Crump had also seen fit

to let Plaintiff's first mistake slide, or even if he had just given her a verbal coaching, she would

not have been at the termination step of Wal-Mart's progressive discipline policy in April 2011.

In the context of § 1981 disparate discipline claims, a plaintiff may establish a prima face

case of race discrimination by presenting evidence of the following:  (1) she was qualified for her

job; (2) the employer subjected her to adverse job action; and (3) her employer treated a similarly

situated employee of another race more favorably.  *See Crawford v. Carroll*, 529 F.3d 961, 970

(11th Cir. 2008); *Riox v. City of Atlanta, Ga.*, 520 F.3d 1269, 1276 (11th Cir. 2008); *Knight v.

Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003).

The only prima facie element above that Wal-Mart contests on this claim is whether

Plaintiff can prove that Wal-Mart treated a similarly situated employee of another race more

favorably.  (Wal-Mart Summ. J. Brief at 13).  Plaintiff admits that she made a mistake by

inadvertently selling a prescription to the wrong customer on one occasion, but she emphasizes

---

[6]The § 1981 count of the complaint seems to focus on Plaintiff's termination in April
2011 based on Wal-Mart's charge that she violated the attendance policy. (Compl., ¶ 52).
However, Plaintiff also potentially raises a § 1981 claim based on her written coaching, occurring
on July 16, 2010, which supplied, in part, the basis to place Plaintiff at the final step of Wal-
Mart's progressive discipline policy when she was ultimately fired.  The written coaching is
discussed at length in the complaint (*id.* ¶¶ 36-39) and those allegations are at least formally
incorporated by reference in Count One raising § 1981 as a basis of liability.  (*Id.* ¶ 51).  Plaintiff
was also questioned extensively in her deposition about the written coaching.  Finally, Wal-Mart
unmistakably acknowledges that it understands Plaintiff to be raising a § 1981 claim based on her
written coaching for her medication error as well as on her termination under the attendance
policy. (Wal-Mart Summ. J. Brief at 16).  Accordingly, the court will do likewise.

that Crump treated her African-American co-worker Angela Rice more leniently.  Specifically,

Plaintiff alleges that Crump immediately issued a written coaching for Plaintiff's first such

mistake, without first giving a verbal coaching, whereas Crump delayed giving a written

coaching to Rice until after Crump was aware that Rice had committed the same type of error

many times.

Wal-Mart does not dispute that Rice and Plaintiff are of different races or that they

engaged in materially similar wrongdoing by selling medication to the wrong customer at check-

out.  Nor does Wal-Mart argue that Rice and Plaintiff were not otherwise similarly situated.

Wal-Mart maintains, rather, that Crump treated Rice and Plaintiff just alike, arguing in its brief

as follows:

> Crump states that he coached Rice for every error of which he had personal
> knowledge and, in fact, Rice was coached for errors on more than one occasion
> and, ultimately, was terminated.  Rice's first coaching, like Plaintiff's was a
> written coaching for a medication error in 2009, (sic) Rice thereafter received a
> Decision-Making Day and, ultimately, was terminated.  Thus Rice and Plaintiff
> were treated identically, and there is no evidence of race discrimination.

(Wal-Mart Summ. J. Brief at 16 (citations omitted)).

The record does bear out that Wal-Mart issued Rice a written coaching on December 30,

2009, for dispensing medication to the wrong patient, resulting from a failure to follow all

checkout procedures, the same offense for which Crump gave the written coaching to Plaintiff.

(Crump Decl. ¶ 10; Ex. 7 to Rancher Decl., Bates 00176-177).  The record also contains a copy

of a Decision Day coaching that Crump gave to Rice on June 24, 2010, along with an Exit

Interview memorandum showing that Rice was terminated on July 15, 2010.  (Ex. 7 to Rancher

Decl. at Bates 00178-79, 00181).  Those records show that they were also based on episodes in

19

which Rice was found to have mistakenly sold a prescription to the wrong customer at checkout.

Nonetheless, there is evidence from which a jury might find that Wal-Mart did treat Rice more favorably.  Plaintiff's deposition testimony, along with her complaint to the Global Ethics Office, supports that she had reported Rice's alleged medication check-out errors to Crump on a number of occasions sometime prior to December 6, 2009.  Wal-Mart did give Rice a written coaching for that type of error, but not until December 30, 2009.  Wal-Mart asserts that "Crump states that he coached Rice for every error of which he had personal knowledge," citing Crump's declaration.  (Wal-Mart Summ. J. Brief at 16).  However, Crump makes no such assertion in his declaration; he simply makes no allegations regarding instances in which he might have had been told or otherwise been aware that Rice had committed medication checkout errors prior to receiving her written coaching.[7]

Moreover, even assuming that Crump's declaration can be read as implying that he had no knowledge of medication check-out errors by Rice prior to her written coaching, such a claim would be substantially undercut by the write-up itself that was given to Rice, which included the following:

---

[7]The only testimony that Crump gives about his relative discipline of Plaintiff and Rice appears in his declaration, which states in relevant part as follows:

> Both [Plaintiff] and Angela Rice were coached for dispensing medication to the wrong patient because of failure to correctly verify the required information using Wal-Mart's TASCO checkout system.  I had to terminate Ms. Rice's employment for 3 incidents within 12 months in July of 2010.  Dispensing medication to the wrong patient is a very serious error, and Wal-Mart skips the "Verbal Coaching" step of Wal-Mart's Coaching for Improvement process as a result of the severity of the error; both [Plaintiff] and Ms. Rice received a written coaching for this infraction and failure to properly execute the check out process using TASCO.

(Crump Decl. ¶ 10).

> Angela has been *verbally coached* to use the correct the correct procedure for
> TASCO and check out for a patient s (sic) mediation.  *There have been similar
> occurrences and near misses with previous patients.  She seems to have difficulty
> pulling the correct bag s (sic) of medication for the correct patient in a prompt
> and confident manner on a consistent basis.*

(Ex. 7 to Rancher Decl. at Bates 00176 (emphasis added)).  Such reasonably supports that Wal-

Mart was indeed aware that Rice had committed similar medication check-out errors prior to her

written coaching and but that she had been given only an *verbal* coaching or even *no* formal

discipline at all on those previous occasions, as Plaintiff claims.  Wal-Mart has failed to show

that it is entitled to summary judgment on this claim based on Plaintiff's supposed inability to

prove that Wal-Mart treated a similarly situated employee of another race more favorably.

Wal-Mart is also not entitled to prevail based on the evidence as it relates to the second or

third stages of the *McDonnell Douglas* analysis.  Once a prima facie case of discrimination is

shown, the burden shifts to the employer to point to evidence in the record supporting that the

difference in treatment was based on some reason other than race.  *See St. Mary's Honor Center*,

509 U.S. at 507-08.  Wal-Mart attempts to do so by reference to evidence that Plaintiff concedes

that she was guilty of the medication error that led to her written coaching, as well as the

seriousness of that infraction.  (Wal-Mart Summ. J. Brief at 16).  However, the fact that an

employee admits violating a work rule does not preclude recovery under § 1981 where the

employee can show that the employer was aware that one or more other employees also violated

the same work rule and that the employer declined to discipline them in like fashion because of

race.  *See McDonald*, 427 U.S. at 282-83.  In such circumstances, the employer's evidence must

tend to explain the disparate discipline of the employees in question; it is not enough to show

merely that discipline against the plaintiff might have been justified generally.  *See id.;*

21

*Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1336 (11th Cir. 2000), *overruled on other grounds, Manders v. Lee*, 338 F.3d 1304, 1328 n. 52 (11th Cir. 2003); *Lathem v. Department of Children and Youth Services*, 172 F.3d 786, 793 (11th Cir. 1999). While it is assumed that the record provides a legitimate basis for the decision to give Plaintiff a written coaching for her first medication error, nothing referenced by Wal-Mart purports to explain why Rice appears not to have been treated similarly.[8]

### c.     The Decision-Day Coaching

Plaintiff additionally appears to claim that her Decision-Day coaching constituted disparate treatment in violation of § 1981. In particular, in discussing her § 1981 discrimination claims in her brief, she argues that such discipline was "not legitimate," and she argues that Wal-Mart has not asserted that it was "non-discriminatory." (Pl. Opp. Brief at 33). Wal-Mart has responded by arguing that Plaintiff may not recover under § 1981 because she has not asserted in her complaint or otherwise that her Decision-Day coaching amounted to discrimination because

---

[8]     Wal-Mart also makes a single-sentence argument in a footnote of its brief that both Plaintiff and Crump are white and that such circumstance "does not support an inference of race discrimination against [Plaintiff]." (Wal-Mart Summ. J. Brief at 13 n. 6). While the fact that Plaintiff and Crump are the same race may be relevant fact for the jury to consider in determining whether Crump's actions were because of race, it is insufficient in itself to *negate* an inference of race discrimination that arises from the evidence indicating that Wal-Mart was more lenient in disciplining Rice. In fact, the Supreme Court has "rejected any conclusive presumption that an employer will not discriminate against members of his own race." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 78 (1998). "Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group." *Id.* (quoting *Castaneda v. Partida*, 430 U.S. 482, 499 (1977)). Even assuming that the record supports that the difference in treatment between Plaintiff and Rice could have been based on some reason other than race, the evidence is not so cut and dried that it can be determined as a matter of law that some other reason was, in fact, the true reason. *See Reeves*, 530 U.S. at 148.

of race.  (Wal-Mart Reply Brief at 12-13).  The court agrees with Wal-Mart.

Plaintiff explains at some length in the Complaint that her Decision-Day coaching was unfair and otherwise unwarranted because she did not actually do anything wrong.  (Compl. ¶¶ 22-31).  She has also pled that the coaching was "the nepotistic act of a manger, Lasseter, who placed his child's convenience over [Wal-Mart's] policy and Plaintiff's job security."  (*Id.* ¶ 39).  Plaintiff gave similar testimony during her deposition.  (*See* Pl. Depo. at 159-70).  However, as Wal-Mart argues, § 1981's substantive prohibition is directed against adverse employment decisions amounting to discrimination based upon *race.*  It does not reach employment decisions motivated by other reasons, even those that one might reasonably characterize as "illegitimate," "unfair," or even otherwise "discriminatory."  *See Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1987); *Page v. Winn-Dixie Montgomery, Inc.*, 702 F. Supp. 2d 1334, 1353 (S.D. Ala. 2010); *Pate v. Chilton County Bd. of Educ.*, 853 F. Supp. 2d 1117, 1129 (M.D. Ala. 2012); *cf. Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) ("Title VII does not require the employer's needs and expectations to be objectively reasonable; it simply prohibits the employer from discriminating on the basis of membership in a protected class."); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984) ("[An] employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a [legally prohibited] discriminatory reason.").  Thus, § 1981 does not generally prohibit an employer from acting based on nepotism or personal favoritism.  *See Lawson v. KFH Indust., Inc.*, 767 F. Supp. 2d 1233, 1244-45 (M.D. Ala. 2011); *cf. Womack v. Runyon*, 147 F.3d 1298, 1300 (11th Cir. 1998) (per curiam) (male employee could not maintain Title VII sex discrimination claim based on contention that he was

23

denied a promotion due to favoritism shown to supervisor's alleged paramour).  Because Plaintiff

does not plead or prove that her Decision Day coaching was motivated by race, that disciplinary

action cannot form the basis of a disparate treatment claim under § 1981.

### d.    Termination Based on the Attendance Policy

Plaintiff's final § 1981 claim is founded upon her termination on April 27, 2011.  Wal-

Mart states that it terminated Plaintiff because her attendance records showed that she had

accumulated four unapproved absences within the preceding six months, which, under the Wal-

Mart's attendance policy, called for the next step applicable to Plaintiff under the Coaching

Policy.  And because she had an active Decision Day coaching on her record, that next step was

termination.  At issue here is whether Wal-Mart treated similarly situated employees more

favorably than Plaintiff.  Specifically, Plaintiff alleges that when Brittany Collins and Donna

Perry, two African-American women who also worked in the pharmacy, would call out and miss

a scheduled shift, Crump would access Wal-Mart's computer system "after the fact" and take

them off the schedule, thereby eliminating what would have otherwise counted as an unapproved

absence.  (Pl. Summ. J. Brief at 22, ¶ 34).  Plaintiff testifies that, on two or three occasions, she

witnessed Crump log on to the computer system and change the schedule by removing time that

Collins was supposed to work so that her absence would not count against her.  (Pl. Depo. at

213-14).  Plaintiff suggests that, on April 22 and 25, 2011, Rancher did the same for two days

that Collins had missed.  (*Id.* at 214-15).  Neither date was counted as an absence against Collins

according to her attendance records.  (Ex. 6 to Rancher Decl., Bates 00166-167).  Plaintiff claims

that, by contrast, her own absences went on her attendance record, stayed there, and were used to

terminate her employment.

In response, Wal-Mart urges that it is entitled to summary judgment, pointing to the respective declarations of Crump and Rancher in which they deny ever changing the schedule to cover up an employee's absence or assist them in avoiding discipline. (Rancher Decl. ¶ 5; Crump Decl. ¶ 6). Crump and Rancher admit that they did at times change work schedules to accommodate requests made sufficiently in advance of a shift by various employees, including Plaintiff. (Rancher Decl. ¶¶ 6, 16; Crump Decl. ¶¶ 5-6; *see also* Pl. Depo. at 189-90, 250). However, Crump and Rancher both claim that Wal-Mart's scheduling software program did not allow them access to the system to alter a work schedule less then 24 hours before a shift. Thus, it would have been impossible, Wal-Mart argues, to make changes to the schedule after a shift had ended or even on the same day it was to occur, in order to keep an absence from counting against an employee. (Rancher Decl. ¶ 5; Crump Decl. ¶ 4).

Wal-Mart maintains that the although "Plaintiff *believes* Crump and Rancher altered the schedule after the fact, the uncontroverted *evidence* [in the form of Crump and Rancher's own declarations] demonstrates that it *was not possible to do so*." (Wal-Mart Reply Brief at 7, ¶ 34 (emphasis original)). Wal-Mart thus argues that it did not treat Collins or Perry more favorably than Plaintiff. However, Plaintiff has given sworn deposition testimony that she *personally witnessed* Crump on two or three occasions alter Collins' schedule when she called out so that her absences would not count against her. (Pl. Depo. at 213-14). She also has given testimony that could be interpreted as alleging that Rancher changed the schedule for Collins the same day when she called out on Friday, April 22, 2011. (*Id.* at 214-15). Wal-Mart may certainly be correct that those events did not occur as Plaintiff claims. Plaintiff may be mistaken about what she thinks she saw or about what she remembers. Or she could simply be lying. Nonetheless,

25

Plaintiff has testified that she personally witnessed those things happen.  Credibility

determinations are for a jury, not the court at summary judgment.  Crump and Rancher's denials,

even if buttressed by assertions that Wal-Mart's computer system made it impossible to change

the schedule after the fact or on the same day of a shift, are not so objectively overwhelming that

they render Plaintiff's testimony inherently incredible such that the court might disregard it at

summary judgment.  *See Galvez v. Bruce*, 552 F.3d 1238, 1240 n. 1 (11th Cir. 2008); *Price v.*

*Time, Inc.*, 416 F.3d 1327, 1345 (11th Cir. 2005); *United States v. Davis*, 809 F.2d 1509, 1512-

13 (11th Cir. 1987).

Even setting aside whether anyone altered Collins's schedule to cover up absences,

Plaintiff additionally contends that Collins received more favorable treatment with respect to the

unapproved absences she actually *was* charged with.  (Pl. Brief at 24-25, ¶ 37; *id.* at 32).  On this

score, Wal-Mart's attendance policy provides in relevant part:

> If you have more than three unexcused absences in a rolling six month period, you
> will be subject to disciplinary action.  If you have an active coaching for any
> reason (not just attendance/punctuality) you advance to the next coaching level if
> you develop four unexcused absences.  At that point, you will continue to advance
> to the next level of coaching for each subsequent unexcused absence.

(Attendance Policy, Bates 00451).

Rancher indicates that she decided to terminate Plaintiff in April 2011 because she had

accrued four unexcused absences within the preceding six months, which called for the next level

of coaching applicable to Plaintiff.  (Rancher Decl. ¶ 12).   And because Plaintiff had an active

Decision-Day coaching, the next step under the Coaching policy was termination.  (*Id.*)  As Wal-

Mart emphasizes, Rancher also terminated Collins's employment for violating the attendance

policy in August 2011.  However, the record also supports that, before doing so, Wal-Mart had

failed to impose discipline for numerous absences by Collins that violated the attendance policy, or at least that Collins was not disciplined until after she had accrued still more absences that amounted to additional, independent violations of that policy.

First, Collins received an unapproved absence on December 22, 2010.  (Ex. 6 to Rancher Decl., Bates 00166).  That absence would appear to have rendered Collins subject to a written coaching, based on the fact that she had received a verbal coaching on October 14, 2010, for "excessive absences in [a] six month period," with the last unapproved absence before that having come on September 16, 2010.  (Ex. 6 to Rancher Decl., Bates 00160, 00166).  In fact, the document memorializing Collins's verbal coaching expressly warned that her "next absence will result in written coaching thru (sic) [January 16, 2011]."  (*Id.*, Bates 00160).  Despite that, Collins did not receive a written coaching for her unapproved absence on December 22, 2010.  She also had unapproved absences on February 13, 2011, and February 25, 2011.  (*Id.*, Bates 00166).  Those, however, did not immediately prompt discipline either.  That was so even though the latter was also at least her fourth unapproved absence within the preceding six months, which would seem to have called for a written coaching, or even a Decision-Day coaching if she had received a write-up for the December 22nd absence.  It was only following another unapproved absence almost two months later, on April 21, 2011, also Collins's fourth in the preceding six months, that Rancher gave Collins a written coaching on May 2, 2011, "for several occasions of being absent from work."  (*Id.* at Bates 00166, 00161).  Collins then registered her fifth unexcused absence within that same six-month period (from December 22, 2010) on June 16, 2011.  (*Id.*, Bates 00166).  Wal-Mart's attendance policy suggests that Collins was in line for at least a Decision Day coaching at that point, but Rancher did not give her one at that time.

27

Instead, it was not until after Collins had another unapproved absence on July 9, 2011, also her fifth within the preceding six months, (*id.*) that Rancher gave her a Decision Day coaching, on July 25, 2011.  (*Id.*, Bates 00166, 00162).  After having two more unexcused absences, on August 11th and 14th of 2011 (*id.*, Bates 00166)[9], her fifth and sixth, respectively, in the preceding six months, Rancher decided to terminate Collins's employment on August 16, 2011, based on her attendance problems.  (*Id.*, Bates 00165; Rancher Decl. ¶ 12).   Premised on the foregoing, however, a jury could reasonably find that Collins was treated more leniently for her repeated attendance policy violations than was Plaintiff.

Wal-Mart is also not entitled to summary judgment on this claim based on the second and third steps of the *McDonnell Douglas* analysis.  As with Plaintiff's claim arising out of her written coaching, Wal-Mart has proffered sufficient evidence to support that Wal-Mart terminated Plaintiff's employment based on a belief that she had violated the attendance policy.  However, Wal-Mart again does not acknowledge that anyone received more favorable treatment in connection with their unexcused absences, so Wal-Mart has not endeavored to explain why Plaintiff was not treated similarly.  Rancher does claim that "Collins had attendance problems for a while" but that she was able to escape discipline because she "had been careful to avoid excessive occurrences during any rolling six month period."  (Rancher Decl. ¶ 13).  However, the record reasonably suggest that Collins did not avoid absences that rendered her subject to discipline under the formal terms of Wal-Mart's attendance policy so much as that Rancher

---

[9]Collins was also absent on August 12, 2011, but that occurrence was deemed to be recurring with her absence the day before.  Accordingly, those two missed days were counted as only a single absence for purposes of the attendance policy.  (Ex. 6 to Rancher Decl., Bates 00166).

refused or otherwise failed to discipline Collins for those absences when they accrued, despite having the authority, if not at least a nominal obligation, to do so.  Wal-Mart's motion for summary judgment is due to be denied as to this claim.[10]

### B.   FMLA Claims

#### 1.   Introduction

The FMLA's central provision guarantees eligible employees 12 weeks of unpaid leave in a one year period because of "a serious health condition that makes the employee unable to perform  the functions of the position of such employee," 29 U.S.C. § 2612(a)(1)(D).  *See also Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 86-87 (2002); *Cooper v. Fulton County, Ga.*, 458 F.3d 1282, 1285 (11th Ci r. 2006); *Cruz v. Publix Super Markets, Inc.*, 428 F.3d 1379, 1382 (11th Cir. 2005).  Leave must be granted, when "medically necessary," on an intermittent or part-time basis.  29 U.S.C. § 2612(b)(1).  The Act makes it unlawful for an employer to "interfere with, restrain, or deny the exercise of" these rights, *id.*, § 2615(a)(1), and violators are subject to consequential damages and appropriate equitable relief, *id.*, § 2617(a)(1).  "To preserve the availability of these rights, and to enforce them, the FMLA creates two types of

---

[10]In a footnote, Wal-Mart suggests it is entitled to summary judgment because "Plaintiff now admits she lied on her employment application" about her criminal history.  (Wal-Mart Summ. J. Brief at 18 n. 9).  Accordingly, Wal-Mart posits, "Plaintiff's employment ... would have ended even without her attendance or performance problems had Wal-Mart learned of her dishonesty."  (*Id.*)  This argument is frivolous.  Even assuming that Plaintiff did lie, Wal-Mart implicitly admits that it did not know that when it terminated Plaintiff, nor is there any proof that she was fired on that basis.  Accordingly, that cannot be deemed a legitimate reason at the second step of *McDonnell Douglas.  See Turnes v. AmSouth Bank, NA*, 36 F.3d 1057, 1061 (11th Cir. 1994).  Further, while evidence of an employee's wrongdoing acquired after litigation commences can limit the types of relief available, it cannot defeat the employer's liability for taking an unlawful employment action.  *See McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 357-60 (1995); *Wallace v. Dunn Construction Co.*, 62 F.3d 374, 377-80 (11th Cir. 1995) (en banc).

claims: interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act." *Strickland v. Water Works & Sewer Bd. of the City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001) (internal citations omitted); *see also* 29 U.S.C. § 2615(a); *Hurlbert v. St. Mary's Health Care Syst., Inc.*, 439 F.3d 1286, 1293 (11th Cir. 2006).  Plaintiff has asserted FMLA claims both for interference and for retaliation (Compl. ¶¶ 53-55), which are considered in turn below.

### 2.      **FMLA Interference**

To make out a claim of interference with a substantive right, an employee must demonstrate by a preponderance of the evidence that she was entitled to a benefit that was denied by the employer.  *Drago v. Jenne*, 453 F.3d 1301, 1306 (11th Cir. 2006); *O'Connor v. PCA Family Health Plan, Inc.*, 200 F.3d 1349, 1353-54 (11th Cir. 2000); *King v. Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir. 1999).  The employee need not show that his employer affirmatively *intended* to deny a protected benefit, for the employer's motives in doing so are irrelevant.  *Hurlbert*, 439 F.3d at 1293.  However, a plaintiff who claims that he was unlawfully denied FMLA leave must generally show not only that the leave qualified, in fact, for protection under the FMLA but also that the employee provided sufficient notice to the employer that the leave, at least potentially, so qualified.  *See Wai v. Federal Exp. Corp.*, 461 Fed. App'x 876, 882 (11th Cir. 2012); *Cruz*, 428 F.3d at 1383; *Pagel v. TIN, Inc.*, 695 F.3d 622, 628 (7th Cir. 2012).  In addition, an employee may establish interference based on the employer's failure to comply with its own notice obligations under the FMLA, *see* 29 U.S.C. § 2619(a); 29 C.F.R. § 825.300,

30

where such failure causes the employee to be unable to meaningfully exercise substantive rights granted under the Act. *See Conoshenti v. Public Service Elec. & Gas Co.*, 364 F.3d 135, 144 (3rd Cir. 2004); *Mena-Valdez v. E.M. T-Shirt Distrib., Inc.*, ___ F. Supp. 2d ___, ___, 2012 WL 2989994, *4 (D.P.R. 2012); 29 C.F.R. § 825.300(e); *cf. Cooper*, 458 F.3d at 1285-86 (employer could not prevail on FMLA claim based on employee's failure to provide medical certification for leave where employer failed to provide timely written notice of medical certification requirement to employee).

Plaintiff's interference claim is founded upon her termination on April 27, 2011. For purposes of this claim, the parties agree that Plaintiff was discharged based upon four unapproved absences within the preceding six-month period, as follows: (1) an absence on November 4, 2010; (2) an absence coded for November 22, 2010, based on three unapproved tardies or otherwise incomplete shifts; (3) a single "recurring" absence based on two consecutive days she missed on December 29-30, 2010, from bronchitis; and (4) an absence on January 22, 2011, based missing more than half her shift. (*See* Rancher Decl. ¶¶ 9-13; Ex. 4 to Rancher Decl., Bates 00004-00006). Plaintiff argues, however, that at least one of those absences qualified for FMLA protection. Plaintiff further maintains, and Wal-Mart does not dispute, that she would not have been subject to any discipline if she had no more than three unapproved absences, meaning that if even one of the absences was FMLA-protected, she would have a viable claim for interference. *See* 29 C.F.R. § 825.220(c) ("FMLA leave [cannot] be counted under 'no fault' attendance policies"; "employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions" ); *Bailey v. Pregis Innovative Packaging, Inc.*, 600 F.3d 748, 749 (7th Cir. 2010). In addition,

Plaintiff claims that Wal-Mart interfered with her rights by failing to afford her required notice of her FMLA rights, specifically her right to take intermittent leave, which caused her to be unaware that she might request such leave for her IBS and migraine headaches. (*See* Compl. ¶¶ 13, 54; Pl. Depo. at 267; Pl. Opp. Brief at 37-38).

Wal-Mart contends that it is entitled to summary judgment on several grounds. First, Wal-Mart maintains Plaintiff cannot establish that any of the unexcused occurrences used to justify her termination resulted from a "serious health condition" within the meaning of the FMLA. Wal-Mart argues that the bronchitis that caused Plaintiff's recurring absence in late December 2010 does not constitute a serious health condition. (Wal-Mart Summ. J. Brief at 20-21 n. 10). Wal-Mart similarly contends that Plaintiff's IBS is not a serious health condition and further that she cannot link it to any of the particular absences forming the basis for her discharge. (*Id.* at 20-21). Third, while Wal-Mart acknowledges that Plaintiff alleges that she experiences periodic migraine headaches, Wal-Mart maintains that she has not pled that a migraine caused her to miss any of the time considered in the decision to fire her. (*Id.*). Finally, Wal-Mart contends that even if Plaintiff can show that her termination was based on time missed because of a migraine or IBS and that each is a serious health condition, Plaintiff failed to provide Wal-Mart with sufficient notice that any sought leave at issue qualified for protection under the FMLA. (*Id.* at 21-22).

The court concludes that Wal-Mart is not entitled to summary judgment on Plaintiff's FMLA interference claim. As explained below, a jury question exists as to whether at least the unexcused absence on January 22, 2011, was caused by Plaintiff's IBS. Further, Wal-Mart has not carried its initial burden to show the absence of a genuine issue of fact on whether that health

condition was "serious" as required to be protected under the FMLA.  Wal-Mart has likewise

failed to show that it is entitled to summary judgment based on Plaintiff's alleged failure to

provide sufficient notice that her absence on that occasion was potentially FMLA qualifying.

Wal-Mart insists that Crump and Rancher always coded Plaintiff's medically-related

incomplete shifts as *authorized* leave, which therefore did not count against her under Wal-

Mart's attendance policy.  (S*ee* Wal-Mart Summ. J. Brief at 22; Wal-Mart Reply Brief at 16-17).

However, even assuming that Crump and Rancher so testified, the record supports that Plaintiff's

incomplete shift on January 22, 2011, which was undisputedly both coded as an *unexcused*

absence and used a basis for her termination, was caused by a flare-up of her IBS.  In her

deposition, Plaintiff describes an episode that occurred sometime "after the first of the year,

[2011]," in which her IBS caused her to suffer bloody bowel movements while at work.  (*Id.* at

36-37).  She says that such happened "maybe two or three hours into her shift" and required her

to go home for the day.  (*Id.*)  Plaintiff further testified that, in the six months before her

discharge in April 2011, her IBS caused her to leave work early on two separate occasions, both

at close to lunchtime, once when Crump was there, and once when Rancher was her supervisor.

(Pl. Depo. at 198-201).  Crump's employment with Wal-Mart ended in December 2010, so he

could not have had any involvement in coding the absence on January 22, 2011.  Rancher, on the

other hand, had been working as a staff pharmacist in the store pharmacy with Plaintiff since

May 2010, and Rancher was formally made Pharmacy Manager at the end of January 2011.  A

jury could find that Plaintiff's testimony describing the second of the two days that she claims to

have left work early because of IBS in the six months before her termination also referred to the

episode she had earlier discussed about bleeding at work.  Finally, Plaintiff's description of those

33

events dovetails with her time record for January 22, 2011.  (*See* Ex. 5 to Rancher Decl., Bates 00683).  The date is not long after the beginning of the new year.  Plaintiff clocked in at 8:45 a.m. and clocked out for the day at 11:37 a.m. without taking a break.  (*Id.*)  That is close to lunchtime, and it amounts to just under three hours into her shift.  (*Id.*; Ex. 4 to Rancher Decl., Bates 00004).  Moreover, a review of Plaintiff's time records from the beginning of 2011 through her termination on April 27th discloses no other day that resembles Plaintiff's description of the IBS bleeding episode.[11]  Based on the foregoing, a jury could reasonably determine that Plaintiff's incomplete shift on January 22, 2011, occurred because of the bleeding associated with her IBS.

Wal-Mart argues that Plaintiff's IBS was not a "serious health condition," and thus cannot justify FMLA leave.  Wal-Mart recognizes that the term "serious health condition" is defined by the FMLA to include "an illness, injury, impairment, or physical or mental condition that involves ... continuing treatment by a health care provider."  29 U.S.C. § 2611(11)(B)[12].  Wal-Mart then posits that Plaintiff's IBS does not qualify under that definition, based upon the following:  "In 2009, Plaintiff received treatment once from Dr. Amin in Gadsden; he diagnosed

---

[11]January 22, 2011, is the only date between the first of that year until her termination on April 27, 2011, that Plaintiff worked and clocked out for the day anytime before even 5:00 p.m. It is also the only date in 2011 that Plaintiff clocked in and worked less than four hours.  Indeed, the only dates in 2011 that Plaintiff clocked in and was credited with less than even six hours were January 28th (5.94 hours, 11:38 a.m. to 6:04 p.m., 30 min. break) and February 8th (4.15 hours, 3:10 p.m. to 7:19 p.m., no break).  (Ex. 5 to Rancher Decl., Bates 00683, 00684).  Both of those dates were coded as "Authorized Worked Not Scheduled."  (Ex. 4 to Rancher Decl., Bates 00004).

[12]A "serious health condition" may also be "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility."  29 U.S.C. §  2611(11)(A).  Plaintiff does not claim that she received inpatient care for her IBS, however.

her with IBS.  He did not continue to treat her for the condition, however, as he determined that there was no treatment that would help Plaintiff."  (Wal-Mart Summ. J. Brief at 21 (citation and footnote omitted)).  Wal-Mart cites no relevant caselaw, regulations, or other authorities on this issue.

As the movant for summary judgment, Wal-Mart bears the initial burden to identify evidence in the record that either (1) negates an essential element of Plaintiff's claim or (2) demonstrates that Plaintiff is lacking sufficient evidence to establish such an element.  *See United States v. Four Parcels of Real Property in Green and Tuscaloosa Counties*, 941 F.2d 1428, 1438 & n. 19 (11th Cir. 1991) (en banc); *Clark*, 929 F.3d at 606-08; *see also Kernel Records Oy v. Mosely*, 694 F.3d 1294, 1208-09 (11th Cir. 2012).  Wal-Mart's meager factual and legal assertions, however, do neither with respect to whether Plaintiff's IBS amounted to a condition involving "continuing treatment by a health care provider" under 29 U.S.C. § 2611(11)(B).  As a threshold matter, Wal-Mart has failed to cite any authority on the issue beyond the bare words of that statute, whose meaning is far from self-evident.  Thus, Wal-Mart offers nothing to flesh out the applicable legal standards or to explain how they apply in concrete circumstances.  This "court has no duty to research and construct legal arguments available to a party."  *Adler v. Duval County Sch. Bd.*, 112 F.3d 1475, 1481 n. 12 (11th Cir. 1997) (quoting *Head Start Family Educ. Program, Inc. v. Cooperative Educ. Serv. Agency 11*, 46 F.3d 629, 635 (7th Cir. 1995)).  Wal-Mart's failure in this regard is enough to preclude summary judgment on this issue.  *Cf. Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("A passing reference to an issue in a brief is not enough, and the failure to make arguments and cite authorities in support of an issue waives it.").

35

It is also unclear how Wal-Mart conceives that its proffered facts regarding Plaintiff's IBS and her treatment by Dr. Amin[13] might either negate that Plaintiff's IBS "involves continuing treatment by a health care provider" or demonstrate that Plaintiff lacks sufficient evidence to establish that proposition.  That is especially so given the paucity of legal authorities.  Even if all of Wal-Mart's cited circumstances are taken as true, they do not negate the element insofar as it cannot be said that there is nothing else that Plaintiff might prove that would allow her to establish that her IBS "involves continuing treatment by a health care provider."  *See Adickes*, 398 U.S. at 153-59; *Clark*, 929 F.2d at 606-07.   Most notably, for example, Wal-Mart's referenced facts do not purport to foreclose that Plaintiff might have been treated for her IBS by health care providers other than Dr. Amin.[14]  Further, a defendant moving for summary judgment

---

[13]In addition to what is recited in the argument section of its brief, Wal-Mart had advanced several other factual propositions that relate to the nature of Plaintiff's IBS in the earlier "Statement of Facts" section, as follows:

39.   Plaintiff was diagnosed with ... IBS in 2009. ...

40.   Plaintiff's IBS causes constipation and diarrhea, spasms, and exhaustion, and on two occasions caused bleeding.

41.   There is no prescription treatment for Plaintiff's IBS; the only way she can treat the symptoms is with over-the-counter Imodium, which does not always help.

42.   Dr. Amin diagnosed Plaintiff's IBS, but Plaintiff has not been treated by Dr. Amin since the diagnosis.

(Wal-Mart Summ. J. Brief at 10-11 (citations omitted)).

[14]Because Wal-Mart fails to satisfy its initial burden on this issue, Plaintiff is not required to respond with evidence showing the existence of a material fact.  *See Adickes*, 398 U.S. at 160. Nonetheless, Plaintiff has come forward with evidence indicating that, in addition to the two times she saw Dr. Amin, she also saw other providers for her IBS.  She says, for example, she has been treated for it multiple times in hospital emergency rooms, including once in about

cannot carry its initial burden simply by saying that the plaintiff lacks evidence, *Clark*, 929 F.2d at 608, or by merely reciting evidence that itself would not be legally sufficient proof on a given issue. *See Adickes*, 398 U.S. at 153-59. Rather, absent a showing that would negate an essential element, a movant generally must point to evidence tending to show the limits of the proof that the nonmovant possesses. *See Clark*, 929 F.2d at 607-08 (discussing how the defendant asbestos manufacturer moving for summary judgment in the Supreme Court's *Celotex* decision satisfied its initial burden by noting that the plaintiff "had failed to identify, in answering interrogatories specifically requesting such information, any witness who could testify about the decedent's exposure to [the manufacturer's] asbestos products"). Wal-Mart's evidence and arguments fail in that task, so Wal-Mart is not entitled to summary judgment based on the premise that Plaintiff's IBS does not involve continuing treatment.

---

November 2009 when she had blood in her stool. (Doc. 19-1, ¶ 7; Pl. Depo. at 35-39). She also saw Dr. Patel sometime in late 2009 or early 2010 specifically because she was experiencing "stomach problems." (Pl. Depo. at 32-33). Dr. Patel then referred her to a specialist, Dr. Amin, whom Plaintiff saw twice, once for an initial consultation and then again on April 30, 2010, for a colonoscopy and endoscopy. (*Id.* at 32-33, 43-44; Docs. 19-12, 19-13, and 19-14). Plaintiff argues that such visits and the other evidence in the record shows that her IBS qualifies as a "chronic serious health condition" under 29 U.S.C. § 825.115(c); *see also Hurlbert*, 439 F.3d at 1296 & n. 15; *Barker v. R.T.G. Furniture Corp.*, 375 Fed. App'x 966, 967 (11th Cir. 2010); *Scott v. Honda Mfg. of Ala., LLC*, 270 Fed. App'x 814, 815 (11th Cir. 2008). In its reply brief, Wal-Mart entirely fails to respond to such evidence. Ultimately, it appears that there is likely sufficient evidence to support that, within one year of January 22, 2011, Plaintiff had received "treatment" for her IBS on at least the two occasions necessary to be potentially deemed "periodic" for purposes of 29 U.S.C. § 825.115(c)(1). *See also* 29 U.S.C. § 825.113(c) (while the term "treatment" does not include "routine physical examinations," it does include "examinations to determine if a serious health condition exists and evaluations of the condition."); *see also generally Aboukora v. Keebler Co.*, 2006 WL 839238, *7 (M.D. Ga. 2006) (evidence created a question of fact as to whether plaintiff had a chronic serious health condition based upon his history of back pain and stomach and intestinal problems); *Myles v. University of Penn. Health Syst.*, 2011 WL 6150638, *6 (E.D. Pa. 2011) (denying summary judgment on FMLA claims based on leave for IBS).

Finally, Wal-Mart contends that it is entitled to prevail on the interference claim on the theory that Plaintiff cannot show that she provided the requisite notice to Wal-Mart for any occurrence counted against her that was eligible for FMLA protection.  Even if an absence is for a reason that would qualify for protected leave under the FMLA, the employer is not guilty of interference unless the employee affords the employer with the notice required under the Act. *See Cruz*, 428 F.3d at 1382.   Where the employee's need for FMLA leave is unforeseeable, as here, "'the employee need only provide her employer with notice sufficient to make the employer aware that her absence is due to a *potentially FMLA-qualifying reason*." *Id.* (quoting *Gay v. Gilman Paper Co.*, 125 F.3d 1432, 1436 (11th Cir. 1997) (emphasis in *Cruz*)).  The employee is not required to expressly invoke the FMLA.  *Id.*, 428 F.3d at 1383; *Cooper*, 458 F.3d at 1286; 29 U.S.C. § 825.303(b).  However, the content of the notice must "provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request."  29 U.S.C. § 825.303(b).  At that point, the onus is on the employer to ascertain whether the employee's absence actually qualifies for FMLA protection.  *Cruz*, 428 F.2d at 1383 (citing *Strickland v. Water Works & Sewer Bd. of the City of Birmingham*, 239 F.3d 1199, 1209 (11th Cir. 2001)).

In support of its claim that Plaintiff cannot show that she provided proper notice, Wal-Mart relies on the declaration testimony of Crump and Rancher.  Both acknowledge that they were aware that Plaintiff had said that she suffers from IBS. (Crump Decl. ¶ 8; Rancher Decl. ¶ 17).  Indeed, Plaintiff says that she discussed her IBS and treatment with both Crump and Rancher at some length and that they had been present when Plaintiff had experienced an IBS "attack" while at work.  (Pl. Depo. at 201–04).  However, Crump and Rancher also deny that

Plaintiff ever mentioned her IBS when asking for time off.  (Crump Decl. ¶¶ 8-9; Rancher Decl. ¶ 17).  Rather, Crump suggests that "on several occasions" Plaintiff only "mentioned that she was having stomach or bladder issues" and that, "a few times," she "requested to leave early because she was not feeling well."  (Crump Decl. ¶ 8-9).  Similarly, Rancher, who would have been Plaintiff's supervisor in January 2011, says, "There were a few occasions when [Plaintiff] asked me if she could leave early because she wasn't feeling well."  (Rancher Decl. ¶ 17).

Plaintiff does not dispute Crump or Rancher's testimony on those matters. Nor does Plaintiff assert that she gave any more specific information to anyone else when she requested to leave early because of a health condition on any particular occasion.  Plaintiff nonetheless argues that the record would allow a jury to find that she provided Wal-Mart with sufficient notice that she was seeking leave for a health condition that at least potentially qualified for protection under the FMLA.  (*See* Pl. Opp. Brief at 37).  That proposition is at least questionable.  *See Cruz*, 428 F.3d at 1384-85; *Gay*, 125 F.3d at 1436.

However, the court concludes that it need not resolve that issue.  That is so because Wal-Mart has failed to show that it is entitled to summary judgment on Plaintiff's alternative argument to the effect that any deficiency in the content of her notice is due to be excused because Wal-Mart is guilty of interference by failing to notify her of her FMLA rights regarding intermittent leave.  (*See* Compl. ¶¶ 13, 54; Pl. Depo. at 267; Pl. Opp. Brief at 37-38).  That failure, Plaintiff asserts, resulted in her being unaware that she could have requested intermittent leave for her IBS.  Such is at least a colorable theory of recovery in these circumstances.  The FMLA imposes obligations on the employer to provide notice to employees regarding their FMLA rights.  In particular, the FMLA itself imposes a general notice requirement, specifying

that each employer must "post ... in conspicuous places on the premises of the employer ... a

notice, to be prepared or approved by the Secretary [of Labor], setting forth excerpts from, or

summaries of, the pertinent provisions of [the FMLA]."  29 U.S.C. § 2619(a).  A regulation

promulgated by the Secretary of Labor essentially restates this statutory posting requirement, 29

C.F.R. § 825.300(a)(1), and further stipulates that if an employer

> has any eligible employees, it shall also provide this general notice to each
> employee by including the notice in employee handbooks or other written
> guidance to employees concerning employee benefits or leave rights, if such
> written materials exist, or by distributing a copy of the general notice to each new
> employee upon hiring.  In either case, distribution may be accomplished
> electronically.

29 C.F.R. § 825.300(a)(3).  There is no doubt that the FMLA provides for intermittent leave.  29

U.S.C. § 2612(b).  Moreover, the sample general notice prepared by the Secretary of Labor

specifically includes information on the availability of intermittent leave under the Act.  *See*

C.F.R. Part 825, Appx. C.  Several courts have recognized that an employee may prevail on an

interference claim based on the employer's failure to comply with general notice requirements

where such failure prevented the employee from properly asserting a right to FMLA leave.  *See*

*Mena-Valdez*, 2012 WL 2989994, *4; *Gilmore v. University of Rochester Strong Mem. Hosp.*

*Div.*, 384 F. Supp. 2d 602, 614-17 (W.D.N.Y. 2005); *Knussman v. State of Md.*, 16 F. Supp. 2d

601, 608 (D. Md. 1998).  In addition, the Supreme Court has stated in dicta that it "may be

reasonable" to conclude that an employer's failure to comply with notice requirements may deny,

restrain, or interfere with an employee's exercise of her right to take intermittent leave where the

employee suffers prejudice as a result of the employer's breach.  *Ragsdale*, 535 U.S. at 90.

Although Plaintiff's allegation that Wal-Mart failed to notify her generally of the

availability of intermittent leave under the FMLA may strike the court as unlikely, Wal-Mart has not pointed to evidence disputing that claim.  Nor has Wal-Mart contested Plaintiff's assertion that such Wal-Mart's failure of notice resulted in her being unaware that she could have requested intermittent leave for her IBS.  Nor has Wal-Mart advanced an argument to challenge the viability of Plaintiff's legal theory that Wal-Mart cannot be heard to complain about the adequacy of the content of her notice because Wal-Mart had breached its own notice obligations to her.  Rather, the exclusive tack Wal-Mart takes in reply to Plaintiff's theory is to fall back on its claim that Plaintiff cannot prove FMLA interference because she supposedly cannot link any of her medically-related incomplete shifts to any of the unexcused occurrences that formed the basis for her termination.  (Wal-Mart Reply Brief at 15-17).  Wal-Mart maintains, rather, that Plaintiff suffered no FMLA injury because Crump and Rancher always coded such shifts as authorized leave, so they were not used as the basis for any adverse job action.  (*Id.*)  The court, however, has already rejected that argument.  Rather, as explained previously, the record supports that Plaintiff's incomplete shift on January 22, 2011, resulted from the IBS bleeding episode she describes in her deposition.  It was also undisputed that such was coded as an unexcused absence and was used in terminating Plaintiff's employment.  As a consequence, Wal-Mart motion for summary judgment is due to be denied as it relates to Plaintiff's FMLA interference claim.

### 3.    FMLA Retaliation

To succeed under an FMLA retaliation theory, a plaintiff must show that the employer intentionally "discriminated against [her] because [s]he engaged in activity protected by the Act." *Strickland v. Water Works & Sewer Bd. of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001).

Essentially, Plaintiff must show that she suffered an adverse employment action that was "motivated by an impermissible retaliatory or discriminatory animus." *Id.* at 1207.  In order to make out a prima facie case of retaliation under the FMLA, Plaintiff must show that: "(1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment decision; and (3) the decision was casually related to a protected activity." *Pereda v. Brookdale Senior Living Communities, Inc.*, 666 F.3d 1269, 1275 (11th Cir. 2012) (quoting *Walker v. Elmore County Bd. of Educ.*, 379 F.3d 1249, 1252 (11th Cir. 2004)).  While Wal-Mart concedes that Plaintiff suffered an adverse employment decision by virtue of her termination, Wal-Mart contends that Plaintiff cannot show that she engaged in statutorily protected activity or that her termination decision was casually related to any such activity.  In particular, Wal-Mart emphasizes that the evidence shows that Plaintiff never invoked the FMLA nor was she ever granted leave under the FMLA.

Plaintiff does not dispute that she did not actually mention the FMLA when asking for time off nor that Wal-Mart granted her FMLA leave.  Plaintiff responds, however, that summary judgment is due to be denied on the theory that she engaged in statutorily protected activity by requesting or taking bathroom breaks for her IBS and that there is sufficient evidence of a causal nexus between such action and her termination.  (Pl. Opp. Brief at 39-40).  The court disagrees.  First, even assuming for the sake of argument that requesting or taking bathroom breaks for her IBS constitutes protected activity, Plaintiff has not pled that Wal-Mart terminated her employment in retaliation for any such activity.  Indeed, the only mention of bathroom breaks in the Complaint is Plaintiff's acknowledgment that "her supervisors *accepted* that Plaintiff might have to visit the bathroom occasionally during bouts of IBS."  (Compl. ¶ 11 (emphasis added)).

Instead, Plaintiff's retaliation claim as pled is founded upon allegations that Wal-Mart failed to advise her of her right to FMLA leave and terminated her employment based on absences that Wal-Mart improperly failed to treat as FMLA leave.  (*Id.* ¶ 55).  While such allegations can support an interference claim, they do not show that Wal-Mart acted out of a retaliatory animus prohibited by the FMLA.  Second, even assuming Plaintiff had pled a retaliation claim associated with her bathroom breaks, Plaintiff cites no evidence to support that those breaks had any relation to Wal-Mart's decision to terminate her employment.  For example, Plaintiff does not refer to any evidence tending to suggest that her bathroom breaks for IBS were ever a bone of contention for anyone who might have played a role in her termination.  Indeed, Plaintiff's own testimony is that nothing "derogatory" was ever said about her IBS.  (Pl. Depo. at 201).  Nor has Plaintiff cited evidence tending to show exactly when she might have requested excessive bathroom breaks because of her IBS, that such requests occurred in relatively close temporal proximity to her discharge, or that anyone who played a role in her termination even knew that such breaks were prompted specifically by IBS.  Wal-Mart's motion for summary judgment is due to be granted as it relates to Plaintiff's FMLA retaliation claim.

**C.    State-Law Claims**

**1.    Breach of Contract**

In Counts Four and Five, Plaintiff seeks to recover under Alabama law for breach of the terms of her contract of employment, express or implied.  Such claims are based on allegations that, in terminating Plaintiff's employment and in disciplining her previously, Wal-Mart violated its "Coaching for Improvement" progressive discipline policy and its Open Door Policy. (Compl. ¶¶ 56-57).  More specifically, Plaintiff contends that Wal-Mart violated its discipline

policy by giving her a written coaching for her first infraction, rather than a verbal coaching.  She

maintains that Wal-Mart likewise acted "contrary to its [Open Door] policy" because Wal-Mart

did not properly investigate and act upon her Open Door complaints and because Wal-Mart

allegedly gave Plaintiff her Decision Day coaching in retaliation for having making such

complaints.  Wal-Mart now moves for summary judgment on those contract claims.

"Under Alabama law, an employment contract is generally terminable at will be either

party, without or without cause or justification- for a good reason, a wrong reason, or no reason

at all. "  *Wal-Mart Stores, Inc. v. Smitherman*, 872 So. 2d 833, 838 (Ala. 2003) (*quoting*

*Culbreath v. Woodham Plumbing Co.*, 599 So. 2d 1120, 1121 (Ala. 1992)).  However, statements

of policy communicated in an employee handbook or otherwise by the employer can represent a

binding contract obligating an employer to satisfy certain conditions precedent to dismissing an

employee.  *Harper v. Winston County*, 892 So. 2d 346, 351 (Ala. 2004) (*citing Hoffman-La*

*Roche, Inc. v. Campbell*, 512 So. 2d 725, 728 (Ala. 1987).  Accordingly, the Alabama Supreme

Court has held:

> "[T]he language contained in a handbook can be sufficient to
> constitute an offer to create a binding unilateral contract.  The
> existence of such a contract is determined by applying the
> following analysis to the facts of each case:  First, the language
> contained in the handbook must be examined to see if it is specific
> enough to constitute an offer.  Second, the offer must have been
> communicated to the employee by issuance of the handbook, or
> otherwise.  Third, the employee must have accepted the offer by
> retaining employment after he has become generally aware of the
> offer.  His actual performance supplies the necessary
> consideration."

> 512 So. 2d at 735.  "'An employer's general statements of policy are no more than
> that and do not meet the contractual requirements for an offer.' " 512 So. 2d at
> 731, quoting *Pine River State Bank v. Mettille*, 333 N.W.2d 622, 626 (Minn.

> 1983).  If the employer reserves in the employee handbook the right to change
> policies unilaterally, its reservation operates as a disclaimer to negate any
> inference that the handbook constitutes an enforceable contract.  *Stinson v.*
> *American Sterilizer Co.*, 570 So. 2d 618, 621 (Ala. 1990).

*Harper*, 892 So. 2d at 351 (footnote omitted).

Plaintiff maintains that Wal-Mart's Coaching Policy and its Open Door Policy became terms of her contract of employment because those policies were communicated to her and she continued to work for Wal-Mart after becoming aware of them.  Wal-Mart responds by arguing that the evidence establishes as a matter of law that Plaintiff was an at-will employee and that neither policy became part of a binding contract.  The court agrees with Wal-Mart, as explained below.

Plaintiff's employment application conspicuously recites in unambiguous terms that, if Plaintiff were hired, Wal-Mart could "terminate [her] employment at any time, with or without cause" and that such "at-will employment  [could] be changed only by a written agreement signed by the President of Wal-Mart Stores, Inc."  (Ex. 3 to Pl. Depo., Bates 00053).  Plaintiff placed her initials immediately after that language, thereby acknowledging that she had "read, underst[ood], and agree[d]" to it, and she also affixed her full signature on the application less than one inch below it.  (*Id.*; *see also* Pl. Depo. at 91, 93-94).  Several days later, Plaintiff signed an addendum that similarly stated, "I understand that this application is not a contract, offer, or promise of employment and that if hired, ... the company can terminate my employment for any time with or without cause."  (Ex. 3 to Pl. Depo., Bates 00057).  Plaintiff does not claim that she did not or could not understand such language.  Courts in other jurisdictions have recognized that this and similar language in Wal-Mart's employment application form belies an intent on the

45

company's part to enter into an employment contract on terms that are other than at-will except by an authorized written agreement.  *See Angel v. Wal-Mart Stores, Inc.*, No. 09–00361 JMS/KSC, 2010 WL 3951997, *1, 8 (D. Hawaii 2010); *Wal-Mart Stores, Inc. v. Guerra*, No. 04–08–00146–CV, 2009 WL 1900411, *1, 9 (Tex. App.- San Antonio 2009); *Roberson v. Wal-Mart Stores, Inc.*, 44 P.2d 164, 166, 172 (Ariz. App. Div. 1, 2002); *Davis v. Wal-Mart Stores, Inc.*, 67 F. Supp. 2d 1274, 1282 (D. Kan. 1999).  State and federal courts in Alabama have also held that similar disclaimers in a job application support that an employee's employment is at-will.  *See Massey v. Krispy Kreme Doughnut Corp.*, 917 So. 2d 833, 841 (Ala. Civ. App. 2005); *Stutts v. Sears, Roebuck & Co.*, 855 F. Supp. 1574, 1582-83 (N.D. Ala. 1994); *Ledbetter v. United Ins. Co. of Amer.*, 837 F. Supp. 381, 383-85 (M.D. Ala. 1993); *Forbus v. Sears, Roebuck & Co.*, No. 90-G-1299-S, 1991 WL 336648, *1-3 (N.D. Ala. 1991), *aff'd in relevant part*, 958 F.2d 1036, 1041 & n. 3 (11th Cir. 1992); *cf. Shelby v. Zayre Corp.*, 474 So. 2d 1069, 1071 (Ala. 1985) (holding that because the plaintiff understood, read, and signed an employment application providing for termination at any time with or without cause, she would not have been justified in relying on an alleged statement of the employer's agent allegedly promising permanent employment).

Further, Plaintiff's testimony is that the Open Door Policy and the Coaching Policy were communicated to her only in general terms by relatively informal means, apparently in computer-based training sessions immediately following her hire and perhaps in some other conversations with unspecified individuals at unspecified times, rather than in a handbook or a similar permanent form.  (*See* Pl. Depo. at 96-97, 132-34, 147-48).  Indeed, Plaintiff makes no claim that

she ever saw the written copies of those policies that Wal-Mart has included in the record.[15]   The

fact that an employer's policy was not formally distributed to employees in a handbook or

otherwise in writing does not necessarily preclude its terms from becoming part of a contract of

employment.  *See, e.g., Ex parte Amoco Fabrics & Fiber Co.*, 729 So. 2d 336, 338-40 & n. 3

(Ala. 1998).  However, given the undisputed evidence that Plaintiff had acknowledged in

multiple, unambiguous writings that she would remain an at-will employee, a jury could not

reasonably find that Wal-Mart's non-written communication of general policy statements became

terms of her employment contract.

Alternatively, even assuming that the Coaching Policy and the Open Door Policy became

part of Plaintiff's employment contract, the evidence fails to show a breach by Wal-Mart.  First,

Plaintiff complains that Wal-Mart gave her a written coaching for her first disciplinary action,

rather than a verbal one.  However, no evidence supports that Wal-Mart specifically promised

that an initial infraction would always result only in a verbal coaching.  In fact, the written

Coaching Policy unambiguously states that such is not the case and that the level of coaching to

be administered was entirely at the discretion of the employer.  (*See* Coaching Policy).

---

[15]Wal-Mart seems to assume that at least the written version of its Open Door Policy
contains an express disclaimer confirming that it is not intended to be taken as a contract offer.
Namely, in its initial brief, Wal-Mart asserts that the Open Door Policy includes the following
provision: "This Policy does not create an express or implied contract or employment or any
other contractual commitment.  Wal-Mart may modify this Policy at its sole discretion without
notice, at any time, consistent with applicable law."  (Wal-Mart Summ. J. Brief at 25-26 (citing
Open Door Policy))  The court's research has revealed cases in which such language did
accompany Wal-Mart's written policies.  *See, e.g., Angel, supra*, at *8.  However, Plaintiff is
correct that the copy of each written policy that Wal-Mart has filed in support of its motion
contains no such disclaimer.  (Pl. Opp. Brief at 45; *see also* Open Door Policy; Coaching Policy)
Oddly, Wal-Mart seems to continue to insist in its reply brief that the Open Door Policy exhibit
contains disclaimer or similar employment-at-will language. (*See* Wal-Mart Reply Brief at 19-
20).

To the extent that Plaintiff claims that Wal-Mart did not resolve her Open Door complaints to her satisfaction, she offers no evidence to support that Wal-Mart ever made any particular promise to do otherwise.  Again, the written policy makes clear there was no such promise.  (Open Door Policy, Bates 00583 ("[W]e cannot promise that your views or opinions will always prevail ...")).  Finally, Plaintiff complains that Wal-Mart violated the Open Door Policy by allowing Crump to give her a Decision-Day coaching in retaliation for Plaintiff's reporting him for failing to discipline Angela Rice for her medication errors.  However, Plaintiff herself recognizes that her Decision Day coaching was given by assistant store manager Dale Lasseter, in direct response to his being extremely upset over an episode, occurring that same day, in which Plaintiff had refused to allow Lasseter's son to pay for a prescription at another counter.  (Pl. Depo. at 159-161).  While Crump witnessed the D-Day coaching and Plaintiff says he made a remark indicating that he resented Plaintiff's having "gone over his head," the evidence does not support that Crump was the one who made the decision to issue the disciplinary action in question.  Wal-Mart is entitled to summary judgment on Plaintiff's contract claims in Counts Four and Five.

### 2.    Breach of the Covenant of Good Faith and Fair Dealing

In her Sixth and final count, Plaintiff asserts a state-law claim based on a theory that Wal-Mart is liable for "breach of the covenant of good faith and fair dealing."  (Compl. ¶ 58).  Such is premised upon Wal-Mart's alleged "violation of its Open Door and progressive discipline policies, its failure to apprize Plaintiff of her federally-protected rights to medical leave and to honor such leave when it was taken, its nepotistic and racially-biased preferential treatment of employees at the expense of Plaintiff, and its retaliatory discharge of Plaintiff."  (*Id.*)  Wal-Mart

moves for summary judgment on this claim.  (Wal-Mart Summ. J. Brief at 27-28).

In her opposition brief, while Plaintiff does discuss her state-law claims for breach of contract generally, she does not discuss this distinct "good faith" theory at all.  (Pl. Opp. Brief at 42-46).  Therefore, this claim is deemed abandoned.  *See Iraoala & CIA, S.A. v. Kimberly-Clark Corp.*, 325 F.3d 1274, 1284-85 (11th Cir. 2003); *Great So. Wood Preserving, Inc. v. American Home Assur. Co.*, 505 F. Supp. 2d 1287, 1297 (M.D. Ala. 2007).  Even if the claim were not abandoned, however, summary judgment still would be warranted, for two reasons.  First, as discussed above, the evidence establishes that Plaintiff was an at-will employee, so there can be no breach of the covenant of good faith and fair dealing with regard to her termination or discipline.  *See Hanson v. New Technology, Inc.*, 594 So. 2d 96, 99 (Ala. 1992); *Wyant v. Burlington Northern Santa Fe R.R.*, 210 F. Supp. 2d 1263, 1294-95 (N.D. Ala. 2002).  Second, to the extent that Plaintiff may be asserting this theory as an independent tort claim, Alabama does not recognize such a cause of action in the employment context.  *See American Cast Iron Pipe Co. v. Williams*, 591 So. 2d 854, 857 (Ala. 1991); *Forbus v. Sears Roebuck & Co.*, 958 F.2d 1036, 1041 (11th Cir. 1992), *abrogated on other grounds by Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863 (1994); *Wyant, supra*.  Accordingly, this claim is due to be dismissed.

## IV.   CONCLUSION

Based on the foregoing, Wal-Mart's motion for summary judgment (Doc. 14) is GRANTED IN PART AND DENIED IN PART.  It is GRANTED as it relates to Plaintiff's § 1981 disparate treatment claim founded on her Decision Day coaching; her claims for retaliation, whether based on § 1981 or the FMLA; and her state-law claims in Counts Four, Five, and Six.  Accordingly, those claims are DISMISSED WITH PREJUDICE.  Wal-Mart's motion is

DENIED, however, as it relates to Plaintiff's § 1981 disparate treatment claims associated with her written coaching and her termination and as the motion relates to Plaintiff's claim for FMLA interference.

      As to the foregoing it is so ORDERED, this 22nd day of January, 2013.

**JOHN E. OTT**
Chief United States Magistrate Judge